IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

**Darren Robinson,**

       **Plaintiff,**

v.                                                                                            Case No. 11-2464-JWL

**BNSF Railway Company,**

       **Defendant.**

### MEMORANDUM & ORDER

Plaintiff filed suit against defendant under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51-60, seeking compensation for carpal tunnel injuries he sustained as a result of his work as a boilermaker for defendant. Defendant moves for summary judgment on the grounds that plaintiff's claim is barred by FELA's three-year statute of limitations (doc. 26). As explained in more detail below, the motion is granted.

**I.     Facts**

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff Darren Robinson is a 32-year-old male employed as a boilermaker by defendant BNSF Railway Company in Topeka, Kansas. Plaintiff began his work with defendant in 1997 as a laborer and, in 2004, became a boilermaker. In late 2006, plaintiff began experiencing pain, tingling, numbness and loss of grip in his hands. Plaintiff testified in his deposition that at the time he began experiencing these symptoms, he attributed those symptoms to his work for defendant. He further testified that, in 2006, he did not attribute

the symptoms to carpal tunnel and he did not know what "the actual problem was." According to plaintiff, his symptoms continued "and then they finally took a rest and then it got worse to the point where it was hard to do the job" and he "needed to find out what was wrong."

Toward that end, plaintiff visited his family doctor, Dr. Eduardo Austria, in November 2007. When asked why he waited nearly one year to see a doctor about his symptoms, plaintiff responded, "Because I, being twenty-nine, I really didn't think, you know the old guys have it and I'm thinking well, maybe, you know, I don't know what it is, it'll go away, it's one of them where you, I don't want surgery any more than the next guy." Dr. Austria discussed with plaintiff the possibility that his symptoms were caused by carpal tunnel syndrome. Plaintiff testified that he and Dr. Austria, at that time, discussed the nature of plaintiff's work for defendant. Plaintiff did not discuss any other activities with Dr. Austria that might cause or contribute to plaintiff's symptoms. Ultimately, Dr. Austria decided to pursue the possibility that plaintiff's symptoms were caused by carpal tunnel syndrome (CTS).

Dr. Austria referred plaintiff to Dr. Sankoorikal for an electromyographic (EMG) exam of both hands. That exam was administered in late November 2007. The EMG showed no evidence of CTS. Plaintiff visited Dr. Austria again on January 18, 2008. They discussed the results of the EMG. Plaintiff was still experiencing tingling, numbness and weakness in his hands. Dr. Austria ordered an MRI of plaintiff's cervical spine to rule out cervical disk disease. The MRI was performed on January 24, 2008 and the results were normal. Plaintiff returned to Dr. Austria on January 31, 2008 and Dr. Austria referred plaintiff to Dr. Parminder Chawla, a neurologist, for another EMG and a second opinion.

On February 12, 2008, plaintiff was evaluated by Dr. Chawla for his hand symptoms. Dr. Chawla's notes reflect that he and plaintiff discussed the nature of plaintiff's work for defendant and that plaintiff is required "to do a lot of wrist work" as a boilermaker for defendant. Dr. Chawla ordered another EMG exam to rule out the possibility of CTS. On February 14, 2008, Dr. Chawla interpreted the EMG and noted as follows:

> Suggestive of bilateral carpal tunnel syndrome. Right slightly worse than left. Please correlate clinically.

Although plaintiff testified that Dr. Chawla diagnosed him with CTS "in early '08" based on the results of the EMG, he now contends that he was not diagnosed with CTS in February 2008 because the results of the EMG were only "suggestive" (meaning that he might have it but might not) and that the results needed to be "correlated clinically," meaning that the EMG results had to be confirmed by physical examination. Nonetheless, Dr. Austria testified that plaintiff was given a "working diagnosis" of CTS by Dr. Chawla in February 2008 for the purpose of sending plaintiff to physical therapy and that he advised plaintiff of that working diagnosis in February 2008. On February 28, 2008, plaintiff began a six-week course of occupational therapy for his injuries. When his condition did not improve, he returned to Dr. Chawla who referred him to a surgeon.

Plaintiff filed his lawsuit on August 17, 2008. On September 3, 2008, plaintiff saw Dr. Mark Barbadan, a surgeon. Dr. Barbadan concluded that the evidence of bilateral CTS in the EMG was supported by symptoms and he recommended surgery. Plaintiff underwent surgery on his wrists in October 2008 and December 2008.

3

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and makes inferences in the light most favorable to the non-movant. *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Although the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party, the "nonmoving party must present more than a scintilla of evidence in favor of his position." *Id.* (quoting *Ford v. Pryor*, 552 F.3d 1174, 1177-78 (10th Cir. 2008)).

## III.    Discussion

"FELA permits railroad workers to recover for injuries caused by the negligence of their employers or fellow employees." *Matson v. Burlington N. Santa Fe R.R.*, 240 F.3d 1233, 1235 (10th Cir. 2001). "To maintain a claim under FELA, the plaintiff must allege and prove that the action was filed 'within three years from the day the cause of action accrued.'" *Id.* (quoting 45 U.S.C. § 56). To grant defendant's motion for summary judgment, then, the court must conclude both that the "statute of limitations has run" and that "there exists no genuine issue of

material fact as to when the plaintiff's cause of action accrued." *Robinson v. BNSF Ry. Co.*, 412 Fed. Appx. 113, 115-16 (10th Cir. 2011) (quoting *Fries v. Chi. & Nw. Transp. Co.*, 909 F.2d 1092, 1094 (7th Cir. 1990)). Given the three-year statute of limitations, plaintiff's cause of action is time barred if it accrued before August 17, 2008—three years before August 17, 2011.

"FELA does not define when a cause of action accrues." *Matson*, 240 F.3d at 1235. In Matson, the Tenth Circuit held that in "cases involving latent injuries which cannot be discovered immediately or those where the injury has an indefinite onset and progresses over many years unnoticed,' the "discovery rule" defines when a FELA cause of action accrues. *Id.* (quotations omitted). Pursuant to that rule, the "statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of the action." *Id.* (quoting *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir.1994)). "This rule imposes upon plaintiffs an affirmative duty to exercise reasonable diligence and investigate the cause of a known injury." *Id.*

In its motion, defendant contends that, even viewing the evidence in the light most favorable to plaintiff, plaintiff undisputedly had knowledge of both the existence and cause of his injuries no later than February 2008. Defendant persuasively argues that the Circuit's opinion in *Matson* is factually analogous to the facts here and, thus, controls the resolution of its motion. In *Matson*, the plaintiff Matson worked for BNSF as a locomotive brakeman and conductor from 1974 to 1998. *Id*. at 1234. At an appointment with a doctor in February 1995, he complained of multiple ailments, including what he described as chronic lower back pain. *Id.* On April 21, 1995, he returned for a second visit, reported increased back pain, and shared his belief the pain was "due to his work on the railroad." *Id*. He and his doctor then discussed "the

5

relation of some of these symptoms or all of these symptoms possibly to some factors of working on the railroad," including Matson's irregular work schedule, his positioning on the locomotive and the length of time he spent in that position. *Id*. Seeking to avoid any invasive treatment for his back condition, Matson began seeing a chiropractor on May 26, 1995. *Id*. The chiropractor gave Matson a work status form on June 1, 1995, which stated that he was suffering from work-related "repetitive vibration causing degenerative joint dysfunction." *Id.* It was later determined that Matson had a herniated and degenerated disc in his lower back, allegedly caused by years of exposure to "whole-body vibrations" while riding on BNSF's locomotives. *Id*. Matson filed his lawsuit on May 29, 1998, alleging that BNSF was liable under FELA for his back injury. *Id*.

BNSF moved for summary judgment, asserting that the claim was barred by FELA's three-year statute of limitations because Matson knew or should have known prior to May 29, 1995, that his back injury was work-related. *Id*. The district court agreed and granted the motion. *Id*. The Tenth Circuit affirmed the district court, concluding that Matson's claims accrued no later than April 21, 1995—the date by which Matson "knew about his back injury and should have known that his employment with the railroad was a potential cause of that injury." *Id*. at 1236. As summarized by the Circuit:

> He complained of "chronic" back pain during his February 1995 appointment and attributed that pain to "his work on the railroad" at his second appointment on April 21, 1995. Matson's doctor similarly "started to draw an inference" during the April appointment that the back pain was work-related, and Matson and his doctor discussed the possible ways the pain could be connected to Matson's employment. By that date, Matson was on notice that his job was a potential cause of his back injury. Armed with that knowledge, Matson had a duty to exercise reasonable diligence and investigate whether this suspicion was correct.

6

*Id.* (citations omitted).

The court agrees that *Matson* strongly supports defendant's motion. In this case, several significant events occurred well outside the three-year window. In late 2006, plaintiff began experiencing pain, tingling, numbness and loss of grip in his hands. He admits that, during that time frame, he at least considered the possibility that his symptoms were related to his work for defendant. In November 2007, plaintiff visited his family doctor for persistent symptoms and he and his doctor discussed the possibility that his symptoms were caused by carpal tunnel syndrome and discussed the nature of plaintiff's work for defendant. Plaintiff and his doctor did not discuss any other activities besides his work for defendant that might have caused his symptoms. In mid-February 2008, plaintiff discussed with his neurologist the nature of his work for defendant and received a "working diagnosis" of CTS . There is no evidence in the record of any other activities that could have caused plaintiff's injuries (or any discussions about other possible causes) besides his work for defendant.

Plaintiff contends that there are disputed facts as to when he knew about both the existence of his injury and the cause of his injury. According to plaintiff, he did not know about the existence or cause of his injury until September 2008, when he received a diagnosis of CTS from Dr. Barbadan. In support of these arguments, plaintiff does not attempt to distinguish *Matson* and, instead, relies on cases from outside the Circuit—*Mest v. Cabot Corp.*, 449 F.3d 502 (3rd Cir. 2006) and *Williams v. CSX Transportation Inc.*, 2005 WL 1845173 (N.D. Ind. July 27, 2005). The facts of those cases, however, varied significantly from those presented here. In *Mest*, the court held that the limitations period under Pennsylvania's discovery rule may be tolled if a plaintiff receives a definitive diagnosis that a plaintiff does not have a particular

disease, and thus that the defendant is not the cause of the injury. *Id*. at 511, 514 (emphasizing that the important point is whether a doctor rules out the actual disease that would implicate the defendant). Relying on *Mest*, plaintiff asserts that he received a negative diagnosis for CST in January 2008 such that the limitations period did not begin to run until after his firm diagnosis in September 2008. The court disagrees. In *Mest*, the plaintiffs continued to exercise reasonable diligence to ascertain the cause of injuries sustained by their cows and no other evidence indicated that the injuries were caused the by defendant until a subsequent diagnosis overturned the initial diagnosis years earlier that had ruled out the specific disease that implicated the defendant. *Id.* at 514-15. While plaintiff's initial EMG was negative for CST, no medical professional ever ruled out the possibility of CST and, in any event, additional evidence suggested CST outside the three-year window. Similarly, no evidence in the record reflects that anything other than plaintiff's work could have been the source of his injuries, regardless of whether those injuries were officially labeled as CST. As explained by the Third Circuit in *Mest*, "a misdiagnosis does not relieve a patient of all responsibility in pursuing the cause of her symptoms, and continued reliance on a misdiagnosis in the face of contrary evidence may be unreasonable." *Id*. at 514. In the face of ample evidence immediately following the negative EMG that plaintiff was, in fact, suffering from CST (and, significantly, in the absence of any suggestion that plaintiff might be suffering from some ailment that would not have been caused by defendant), plaintiff cannot rely on his negative EMG to toll the limitations period.

In *Williams*, the district court denied the defendant's motion for summary judgment and concluded that the FELA statute of limitations did not begin to run until the plaintiff received a diagnosis of CTS. *Id*. at *7. In that case, the only events that occurred outside the three-year

window were plaintiff's complaints of numbness and tingling in his fingers; his doctor's initial suggestion that his symptoms were related to smoking cigarettes; and his doctor's subsequent diagnosis of tennis elbow. *Id.* at *2-3. Unlike plaintiff here, then, the plaintiff in *Williams* was initially given diagnoses other than CTS, neither of which were job-related. *Id.* at *6. Moreover, there was no evidence in the record that anyone outside the three-year window ever considered a diagnosis of CTS or made a connection between the plaintiff's injuries and his job. *Id.* at *3. Here, of course, plaintiff received a working diagnosis of CST back in February 2008 and was never given any information to suggest that the cause of his injuries might be related to anything other than his work for defendant.

Plaintiff's final argument is that defendant has mischaracterized plaintiff's deposition testimony that, back in November 2006, he attributed his symptoms to his work for defendant. Plaintiff contends that this testimony is ambiguous as to whether plaintiff contemporaneously attributed his symptoms to his work back in 2006 or whether he did so only in hindsight. While the court believes that plaintiff's testimony clearly indicates that he contemporaneously attributed his symptoms in November 2006 to his work for defendant, the court would grant summary judgment in favor of defendant even in the absence of plaintiff's testimony. It remains undisputed that plaintiff, in the context of assessing his injuries, discussed the nature of his work with both his family doctor and his neurologist. The record does not reflect any other activities or sources outside of his work that could have caused the pain, numbness and tingling in plaintiff's hands and plaintiff did not discuss any other potential causes with this physicians. The court's decision, then, does not hinge on plaintiff's testimony concerning his subjective beliefs in November 2006. *See Robinson v. BNSF Ry. Co.*, 412 Fed. Appx. 113, 117 (10th Cir.

9

2011) (statute of limitations period governing FELA actions began to run when employee reported neck and back pain and could not identify any other cause of injury).

Plaintiff has not shown any disputed material facts concerning his knowledge of the existence or cause of his injuries. Plaintiff knew or should have known no later than February 2008 that his employment with defendant was a potential cause of his injuries. *See Matson*, 240 F.3d at 1236. Because his lawsuit was filed more than 3 years after that time, it is time-barred. The motion for summary judgment is granted.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 26) is granted.

**IT IS SO ORDERED.**

Dated this 4th day of October, 2012, at Kansas City, Kansas.

s/ John W. Lungstrum  
John W. Lungstrum  
United States District Judge